IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ROMAN HAACK, CODY CLAY, and )
RYAN BANTA behalf of )
themselves, and all other )
plaintiffs similarly )
situated, known and unknown, )
)
      Plaintiffs, )
)
vs. ) No. 17 cv 02854
)
PERSONNEL STAFFING GROUP, )
LLC, DANIEL S. BARNETT, )
individually, DAVID BARNETT, )
individually, Northern )
Illinois Fence, dba COMPLETE )
Northern Illinois Fence OR )
"CNI," COMPLETE FENCE )
(formerly Fox Valley Fence) )
dba CNI, U.S. INSTALLERS dba )
Northern Illinois Fence, and )
RAYMOND HOHE, individually, )
)
      Defendants. )



    The deposition of ROMAN HAACK, called by the Defendants for examination, taken pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Kristi Landolina, Certified Shorthand Reporter, Registered Professional Reporter, and Notary Public, at 1051 Perimeter Drive, Suite 400, Schaumburg, Illinois, commencing at 12:39 p.m. on the 6th day of September, A.D., 2018.

KATHLEEN W. BONO, CSR, LIMITED
630-834-7779

```
 1      Q.   So how many -- how many individuals
 2  did you manage?
 3      A.   Some days I had three, four.  Most of
 4  the days I just had myself and a laborer.
 5      Q.   When you were dispatched to a job and
 6  you arrived, how did you know what to do?
 7      A.   They had -- Ray would be there some
 8  mornings and Kevin would be there some days.
 9  There was a gentleman named Fred Frasier was
10  there.  There was another gentleman named Tom.
11  He's no longer there.  There was another
12  gentleman named Marty White.  They would hand me
13  the paperwork to go and do it.
14      Q.   Those individuals that you just spoke
15  about, who were they?
16      A.   They were, I think -- I don't know
17  what they were considered, superintendents.
18  Nobody knew.  But they would schedule the work
19  for us.
20      Q.   Then they would give you the work?
21      A.   Give us the work orders, pamphlets.
22      Q.   They tell you to go out and do this
23  job?
24      A.   Yes.
```

```
 1      A.    Yes.
 2      Q.    The first page of this Exhibit No. 1,
 3  it's Bates stamped in the right-hand corner.
 4  It's D000055; is that correct?
 5      A.    Yes.
 6      Q.    Have you ever seen this document
 7  before?
 8      A.    No, I have not.
 9      Q.    Do you recognize the writing?
10      A.    The top part is my writing up here,
11  Butch and Ryan.
12      Q.    Who is Butch?
13      A.    That's me, that's my nickname.
14      Q.    You go by Butch?
15      A.    Yes.
16      Q.    So that's your writing?
17      A.    Yes.
18      Q.    What about down the right-hand side,
19  whose writing is that?
20      A.    I could not tell you.
21      Q.    What about the middle page of that?
22      A.    Some of it is mine and some of it, the
23  stuff that's alongside of it, I don't even know
24  what that is, the hours or whatever it is
```

```
 1    job name and all that, I cannot tell you that.
 2        Q.    How about 196, have you ever seen this
 3    document?
 4        A.    Yes.
 5        Q.    What is it?
 6        A.    It was some of our weekly time sheets
 7    they came up with.
 8        Q.    Okay.  So instead of writing it out or
 9    calling it in, they wanted you to turn in this
10    time sheet?
11        A.    Yes.
12        Q.    The hours -- Is that your writing
13    where you would write across how many hours,
14    Monday, 10 and a half hours; Tuesday, ten hours?
15    Is that your writing?
16        A.    Yes.
17        Q.    That is?
18        A.    Yes.  No, not the hours.  I never put
19    hours behind.
20        Q.    The 5:30, so like --
21        A.    5:30 --
22        Q.    First off, let me identify this.  This
23    is Cody Clay.  Did he work for you?
24        A.    He didn't work for me.  He worked for
```

| | | |
|---|---|---|
| 1 | | Northern. He was my laborer. |
| 2 | Q. | Meaning you managed him? |
| 3 | A. | Yes. |
| 4 | Q. | So you were responsible for keeping track of his time? |
| 6 | A. | Yes. |
| 7 | Q. | This is the sheet that Northern gave you? |
| 9 | A. | Yes. |
| 10 | Q. | So just looking at this very briefly, on Monday he started at 5:30 in the morning? |
| 12 | A. | Uh-huh. |
| 13 | Q. | And worked until 4:30? |
| 14 | A. | Yes. |
| 15 | Q. | If you look at the bottom, it says foreman approval. Whose signature is that? |
| 17 | A. | That's Fred Frasier's. |
| 18 | Q. | That's the manager approval, is that your signature where it says foreman approval? |
| 20 | A. | Yes. |
| 21 | Q. | So you had to approve these? |
| 22 | A. | No, I did not approve them. These hours were turned in. |
| 24 | Q. | Okay. |

01:00:31PM (at line 10)
01:01:06PM (at line 20)

```
 1      Defendant Bates stamp D196.  Do you want to take
 2      a look at that?
 3              This is one you said you signed?
 4      A.   Yes.
 5      Q.   It's a Cody Clay weekly time report.
 6      Now you said when you signed this document, you
 7      had the times filled in, like, 5:30 to 4:30,
 8      such as 6:00 to 4:30, right?
 9      A.   Yes.
10      Q.   But you didn't have the time notations
11      above it, like, 10.5 hours?
12      A.   No.
13      Q.   And the 52.5 hours in the lower
14      right-hand corner, right?
15      A.   No.
16      Q.   That was not there when you signed it,
17      right?
18      A.   No, it was not.
19      Q.   Those hours were added after you
20      signed this document?
21      A.   Yes.
22      Q.   The next page, on page 0058, the total
23      hours on this document, very next page?
24      A.   Yes.
```